

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

WESTERN WATERSHEDS PROJECT, et al.,

Petitioners,

vs.

VICKI CHRISTIANSEN (Chief, U.S. Forest Service), et al.,

Respondents.

Case No:  17-CV-202-NDF

---

## MEMORANDUM DECISION AND ORDER

Petitioners Western Watersheds Project, Sierra Club, Wyoming Wildlife Advocates and Gallatin Wildlife Association (collectively, "Petitioners") challenge the United States Forest Service's ("Service") approval of the request by the Wyoming Game and Fish Department ("WGFD") Commission to amend a special use permit to include Alkali Creek Feedground, located in the Bridger-Teton National Forest ("BTNF"), as an elk winter feeding location for use through 2028.  In general, Petitioners allege the Service's 2015 Final Supplemental Environmental Impact Statement ("2015 FSEIS"), Record of Decision ("ROD"), and special use permit for Alkali Creek Feedground are contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m, and the Administrative Procedure Act (APA), 5 U.S.C. § 706. Petitioners complain that the Service's analysis of the impact of the Alkali Creek Feedground on Chronic Wasting Disease ("CWD") was faulty.  Petitioners request the Court vacate and remand the

Service's decision to grant the special use permit.   After considering the filings in this matter, the Court concludes the Service failed to comply with the procedural requirements of NEPA.   Because of this, the Court VACATES and REMANDS the Service's decision to amend the existing 2008 long-term special use permit to reauthorize the continued use of National Forest Service lands for winter elk feedground activities at Alkali Creek Feedground.[1]

## BACKGROUND

I.   <u>Statutory and Regulatory Background</u>

A.   *NEPA Procedural Requirements*

NEPA requires federal agencies to consider the environmental impacts of their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). To accomplish these goals, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major federal actions" that may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). Among other considerations, the EIS must describe (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii).   An agency need not include every possible alternative, nor analyze consequences of alternatives it has in good faith rejected "as too remote, speculative, or .

---

[1] Nothing in this decision or order adjudicates, directs, or prohibits the issuance by the Service of temporary (one year) special use permits to the WGFD Commission for Alkali Creek Feedground, as has been its interim past practice. *See, e.g.,* AR17733-71.

. . impractical or ineffective." *WildEarth Guardians v. National Park Service* 703 F.3d 1178, 1183 (10th Cir. 2013) (citation omitted). Further, an EIS must also assess the direct, indirect, and cumulative impacts of the proposed action, including unavoidable adverse environmental effects. 30 CFR § 1508.25. Cumulative impacts result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or third parties. *Id.* at § 1508.7.

NEPA prescribes the process, not the end result, of agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989). In this regard, NEPA only requires an agency to take a "hard look" at environmental consequences of its actions and to adequately disclose those impacts to the public. *Baltimore Gas,* 462 U.S. at 97-98; *Middle Rio Grande Conservancy Dist.,* 294 F.3d 1220, 1225 (10th Cir. 2002).

B.    *Substantive Management Requirements for National Forest System Lands*

In the Organic Administration Act of 1897, Congress established "a limited multiple-use mandate for management of the National Forests", authorizing use of the forests for the purposes of "improv[ing] and protect[ing] the forest[s]," "securing favorable conditions of water flows," and "furnish[ing] a continuous supply of timber for the use and necessities of citizens of the United States." *Wyoming v. U.S. Dep't of Agriculture,* 661 F.3d 1209, 1221 (10th Cir. 2011) (quoting 16 U.S.C. § 475). In the Multiple-Use Sustained-Yield Act of 1960, Congress expanded that limited multiple-use mandate to include use of the national forests for the additional purposes of outdoor recreation, range, timber, watershed, and wildlife and fish purposes. *See* 16 U.S.C. § 528.

3

Congress delegated the forest management authority to the U.S. Department of Agriculture ("USDA"), and in turn, the Service, to manage National Forest System ("NFS") lands consistent with Congress's multiple-use mandate.

The National Forest Management Act, passed in 1976, instructs the Service to manage each forest unit at two different levels (programmatic level and project or site-specific level) pursuant to multiple-use and sustained yield principles. 16 U.S.C. § 1604. Specific to this case, Congress instructed the Service "[a]t the project or site-specific level, [to] implement[ ] the forest plan[2] by approving or disapproving particular projects using an environmental impact statement, an environmental assessment, or a categorical exclusion," *Utah Environmental Congress v. Bosworth*, 443 F.3d 732, 737 (10th Cir. 2006), and to ensure that each project complies with the applicable forest plan, *see id.* (citations omitted); 16 U.S.C. § 1604(i).

By these laws, Congress intended the Service's discretion and authority to regulate NFS lands to be "broad". *Wyoming*, 661 F.3d at 1235. The regulatory scheme Congress enacted provides for the Service to cooperate with state and local governments in making land management decisions. *See, e.g., id.* § 1604(a) (requiring the Forest Service to develop its Forest Plans in coordination "with the land and resource management planning processes of State and local governments"); 40 C.F.R. § 1506.2(b) (providing that "[a]gencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements"); *accord id.* § 1506.2(c) (same). However, in the end, the statutory framework makes clear that

---

[2] The BTNF Land and Resource Management Plan can be found in the record at AR1-388.

4

Congress contemplated that all final decision-making authority rests with the Service and not in a state or local governmental body.

II.     Factual Background

    A.     *The Jackson Elk Herd and Elk Feedgrounds in General*

The Jackson elk herd comprises one of the largest concentrations of elk in North America. AR17778. The elk migrate across several boundaries, including the BTNF, Grand Teton National Park ("GTNP"), and the National Elk Refuge[3] ("Refuge"). In 2013, the Jackson elk herd had an estimated population of 11,600, with less than a ten percent interchange with adjacent herd units. AR28852; AR28974. Since 1998, wolf activity has influenced the movement of the elk herd in the Gros Ventre drainage,[4] resulting in one large group (as much as 3,221 animals) congregating on one feedground and then moving to another feedground in the drainage. AR22037, 28774.

Wyoming first started to provide supplemental feed to elk in the early 1900's to prevent large-scale die-offs during hard winters. AR28970. Since those early years, feedgrounds have also become an important tool for the State to reduce damage to haystack yards and winter pastures on private lands[5] and to reduce the potential or transmission of brucellosis to livestock.[6] AR10208. On NFS lands, elk feedgrounds are strategically placed near the boundaries to gather elk as they transition from summer

---

[3] The National Fish and Wildlife Service (NFWS) manages the Refuge, which is part of the National Wildlife Refuge System. NFWS has an agreement with the WGFD which calls for a maximum of 7,500 elk on feed at the Refuge during any given winter. AR28971.

[4] East of Jackson Hole lies the Gros Ventre drainage, a semiarid valley running east to west in the middle of approximately one million acres of the BTNF and Shoshone National Forest with no paved roads. AR18879.

[5] Wyoming state law imposes liability on the WGFD Commission to pay for damages to crops caused by big game animals.

[6] Brucellosis is a highly contagious bacterial disease that typically causes an infected female to abort her first calf following infection, and even subsequent calves. AR28977.

ranges down to lower elevations, mostly preventing elk from migrating through private lands in route to lower elevations. *Id.* Service regulations require authorization for feedground use and occupancy on NFS lands.

State-operated feedgrounds are located on BLM, Forest Service, State, and private lands.[7] In terms of the Gros Ventre drainage and in addition to the Refuge, three state-operated feedgrounds provide supplemental winter feed to the Jackson elk herd: Alkali Creek, Patrol Cabin (on state land), and Fish Creek. AR21977. The practice of supplemental feeding is quite controversial and has been the subject of litigation. *See, e.g., Defs. of Wildlife v. Salazar*, 651 F.3d 112 (D.C. Cir. 2011); *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115 (10th Cir. 2009).

B.    *Alkali Creek Feedground*

Alkali Creek Feedground encompasses 91 acres of NFS lands, including an elk tagging corral, a horse corral, a tack shed, a haystack yard containing two hay sheds, a water facility, and a feeding ground. AR27483. It is located about 12 miles from the Refuge, at the bottom of a topographic bottleneck that naturally limits down-river westerly elk movement. AR19144; 28853; 28877–78. This location effectively limits elk movement further down onto the Refuge, as well as onto nearby private lands. AR28878. The WGFD explained to the Service that the objectives of Alkali Creek Feedground were to prevent elk from co-mingling with livestock on private lands and prevent damage on

---

[7] Currently, the WGFD manages 22 state-operated feedgrounds. AR17885. In addition, the Refuge, managed by the NFWS, engages in winter feeding.

private property.[8] *Id.* Elk population density estimates at this feedground are quite high compared to those at the Refuge or at other WGFD feedgrounds.[9] Wolf activity influences elk distribution in the Gros Ventre drainage, resulting in elk aggregating into one large group of up to 2,845 animals. These elk typically congregate on one feedground and move to another feedground in the drainage in response to wolf pressure. AR10208.

C.  *Chronic Wasting Disease (CWD)*

CWD, the equivalent of "mad cow disease," is a fatal prion disease of cervids, which include elk, white-tailed deer, mule deer, and moose.[10] AR29034; AR10283. The disease is easily transmitted,[11] the prion (TSE) agent can contaminate the environment for long periods,[12] and management strategies have failed to stop its spread. *Id*; AR28854; AR28876. As additional challenges, clinical signs of CWD are not diagnostic, there is a long incubation period, there is no treatment, there is no prevention in the sense of vaccination, and CWD is invariably fatal once clinical signs develop. AR18430. These challenges make surveillance difficult and expensive; hence the emphasis on preventing its introduction into the region. AR18431. Once this chronic disease is introduced into a

---

[8] The WGFD contends that without Alkali Creek Feedground, elk-to-cattle brucellosis exposure would be much higher because of Alkali Creek's key location in preventing elk movement downstream and onto private lands. AR28879; Doc. 63, p. 18.

[9] A "high-density" elk population, as defined by a Rocky Mountain National Park study, is one that ranges from 10-100 elk per square kilometer. AR27771. The density for the Refuge is an estimated average of 59.3 elk per square kilometer. AR26284. Average population densities at Wyoming state feedgrounds are much higher, at nearly 2,000 elk per square kilometer. *Id.* Higher still is the estimated population density at Alkali Creek Feedground, which has been estimated between 2,470 to 8,600 elk per square kilometer. *Id.*

[10] There is no evidence that the disease can be transmitted to humans or domestic livestock, AR28978.

[11] "Evidence suggests the disease can pass directly from infected animal to uninfected animal; by contact with soil, plants, or feed contaminated with the prion; or by direct or indirect contact with the carcass of an animal that has died from CWD." AR19635.

[12] "The agent is extremely resistant to chemical disinfectants as well as to physical methods of inactivation. It is still not known whether environments contaminated with TSE agents can ever be completely disinfected." AR18711.

7

population, "CWD can exceed natural rates of mortality, reduce survival of adult females, and decrease population growth of elk herds." AR19277.

While CWD is well-established in south-central Wyoming and northern Colorado, it has yet to reach the Jackson elk herd. AR28876; AR28853. However, research indicates that the disease will continue to slowly spread west on a protracted time-scale.[13] AR28876. Current models projecting the arrival of CWD in the Jackson elk herd are uncertain and predict a broad range of outcomes. AR28854.

As noted above, there is controversy about feedgrounds and their contribution to the introduction and spread of CWD.[14] Petitioners refer to the joint 2007 Bison and Elk Management Plan ("2007 BEMP"), prepared by the NPS and the NFWS for the Refuge, which reported feedgrounds are a significant risk factor for the introduction and rapid spread of CWD.   CM/ECF Document ("Doc.") 43, p. 16; AR17781 (seasonal concentrations of elk create "an unnatural situation that has contributed to . . . an increased risk of potentially major outbreaks of exotic diseases," and "damage to and loss of habitat").   Further, at least one expert with the USDA Animal and Plant Health Inspection Service ("APHIS") thinks "long-term feedgrounds are detrimental to the health of the wildlife." AR26800. The Service itself recognizes "that the WGFC action of feeding elk results in the artificial concentration of elk during winter and early spring that increases risk of disease transmission" (AR11108), and that prevalence of CWD is

---

[13] However, a 2014 briefing paper notes "[s]cientists predict that CWD may arrive at NFS feedgrounds in the near future, as soon as within one year, subsequently affecting the ecosystem food web." AR19635.  CWD has been detected (in deer) within 60 miles of Alkali Creek Feedground. AR28853.

[14] "CWD is not the only disease that could spread as a result of artificial feeding practices; there are a host of other debilitating or infectious diseases as well," (e.g., foot rot, bovine tuberculosis, scabies, paratuberculosis, brucellosis)." *Def'rs of Wildlife v. Salazar*, 698 F.Supp.2d 141, 144 (D.C.D.C. 2010); AR28853.

likely "functionally related to ungulate density" (AR28876). Indeed, in its brief the Service states, "the practice [of supplemental feeding] concentrates elk during the winter months and contributes to the spread of diseases such as brucellosis and CWD." Doc. 62, p.11. Also, the Brief of Amici Curiae Scientists discusses the very high population density estimates of elk at Alkali Creek Feedground, the behavior changes that occur as elk population densities grow (higher frequency and duration of contact), and the corresponding significant risk of disease transmission, both directly between animals and indirectly through the environment. Doc. 55, p. 15; AR26284; 24695. Further, both the NPS and NFWS agree that "elk concentrated on feedgrounds is likely to facilitate the spread of [CWD] when it reaches [the GTNP and Refuge]. As such, an overarching strategy to achieve the goals of the 2007 BEMP is to reduce reliance on winter supplemental feeding of bison and elk, and to transition to complete reliance on natural standing forage at an undetermined time in the future." AR28174. Finally, one court found that the 2007 BEMP for the Refuge "might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program in spite of all the evidence in the record about the dangers of supplemental feeding." *Defs. Of Wildlife v. Salazar*, 698 F.Supp.2d 141, 148 (D.C.D.C. 2010), aff'd 651 F.3d 112, 118 (D.C.Cir. 2011) ("There is no doubt that unmitigated continuation of supplemental feeding would undermine the conservation purpose of the National Wildlife Refuge System").

Intervenor-Respondent State of Wyoming ("the State") is a bit more circumspect in its briefing[15] on the risk of CWD and feedgrounds. The State puts forward two theories – one which postulates that a feedground might attract elk from a large catchment area and congregate them, thereby increasing the introduction of CWD to a new herd area. Doc. 63, p. 20; AR29039. Another theory suggests, based on known low-prevalence rates for the disease in wild elk, there may be little to no impact on elk populations because the purpose of most feedgrounds is to intercept elk migration corridors and prevent further migration. *Id.*; AR29039; 28979. Thus, according to this second theory, feedgrounds could isolate herds from each other and limit inter-herd transmission of CWD. *Id.*

## III.   Procedural Background

The process resulting in the reissuance of the amendment to the special use permit at issue began prior to 2008 when the WGFD Commission asked to continue to operate (or to expand) six feedgrounds on NFS lands. AR10212. Three of these feedgrounds (Alkali Creek, Fish Creek, and Patrol Cabin, including its proposed expansion) provide supplemental feed to the Jackson elk herd in conjunction with the Refuge. AR21977. In response, the Service prepared a Final Environmental Impact Statement ("2008 FEIS"). The 2008 FEIS analyzed three alternatives: a no action alternative denying the special use request; a mid-range action authorizing only the requested feedgrounds but not the

---

[15] The State's brief discusses these two theories but WGFD separately acknowledges "[m]ost wildlife disease professionals consider artificial feeding a potential health threat to the fed animals due to the belief that prolonged congregation of animals around a feeding site increases the probability of disease transmission. This increased probability is generally irrespective of how the disease is transmitted, i.e., direct contact, aerosol, environmental contamination, or infected feces and urine." AR17889.

expansion of Patrol Cabin; and an action fully granting the permit as requested. AR10217–20. As a result, in 2008 the Service granted the permit for several locations but did not authorize the Patrol Cabin expansion and postponed a decision on Alkali Creek Feedground to conduct additional analyses. AR11104-07.

Prior to the 2015 decision on Alkali Creek Feedground, the Service prepared the 2015 Final Supplemental EIS (2015 FSIES), which tiered to the 2008 FEIS. The Service limited the objective and purpose of its 2015 FSEIS to whether the Alkali Creek Feedground permit should be reissued, and if so, under what terms and conditions. AR28776. In light of this objective, the Service analyzed two alternatives in detail and eliminated alternatives from detailed consideration. AR28783–88. Important to the issues raised in this case, the Service eliminated an alternative to improve winter range on the BTNF and eliminate all elk feeding in an effort to restore historical migration routes. AR28787. As to these eliminated alternatives, the Service concluded it was already working to improve winter range through habitat projects (AR28787), and it lacked the authority to direct the WGFD to stop elk feeding because, even without the permit, the WGFD would continue to feed elk on private, State, and other federal lands. AR28787. The Service also eliminated an alternative to construct elk-proof fencing around private lands in the Gros Ventre drainage, concluding this was implausible, would fence in private property to the detriment of landowners, and would negatively affect migration routes. AR28787; 21895. As part of its analysis and specific to the spread and prevalence of CWD, the Service generated a Literature Review Technical Report. AR29160; 29034-45.

On December 1, 2015, the Forest Service amended the existing 2008 long-term special use permit to reauthorize the continued use of NFS lands for winter elk feedground activities at Alkali Creek Feedground. AR30635. The final decision added additional mitigation and monitoring requirements to address potential impacts of CWD.[16] AR30636.

## DISCUSSION

I.   <u>Threshold Questions</u>

A.   *Standing*

As an initial matter, the Service argues that Petitioners lack Article III standing to pursue their claims for relief because they have failed to demonstrate "redressability." Article III standing is a "threshold jurisdictional question" that a court must decide before it may consider the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-101 (1998).

Here, Petitioners are suing on behalf of their members.   "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted, nor the relief requested requires the participation

---

[16] Use of hay obtained from CWD endemic areas is prohibited from being used anywhere on the BTNF.  In addition, the following requirements were imposed on the WGFD:

- Annually test the soil on BTNF feedgrounds to monitor for incidence of CWD prions and annually submit reports of findings if a feasible and economical soil test for prions is developed in the future.  Sampling methodology would be jointly determined by WGFD and the FS, in consultation with APHIS.  (Note-as of 2017, this test was not economically feasible. [AR31044]).
- Annually report CWD mitigation actions that have been taken with regards to feedground management on NFS lands in western Wyoming.  AR 30636; 30852.

of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Sevs.*, 528 U.S. 167, 181 (2000).

The only issue presented is whether Petitioners' members would otherwise have standing to sue in their own right.  To establish Article III standing, Petitioners bear the burden of demonstrating, through their members, that: (1) they have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) that it is likely, as opposed to merely speculative, that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 1149 (2009).  This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Where such a "real need" does not exist, allowing courts to oversee legislative or executive action "would significantly alter the allocation of power . . . away from a democratic form of government," *Summers, supra*, 555 US at 1149, citing *United States v. Richardson*, 418 U.S. 166, 179, 94 S.Ct. 2940 (1974) (Powell, J., concurring).

By the Amended Complaint and further supported by affidavits, Petitioners allege their members have interests in improving public land management, promoting species and habitat protection on public lands, protecting Wyoming wildlife, viewing and enjoying wildlife within the Greater Yellowstone Ecosystem, and supporting the sustainable management of fish and wildlife populations.  Petitioners allege the legal violations by the Service in renewing the permit cause concrete injury to these interests,

13

including adversely affecting the behavior of elk and creating an enormous risk of disease transmission in the elk and other wildlife populations of interest to Petitioners' members. Petitioners further allege a vacatur of the challenged permit pending full compliance with NEPA and other legal requirements will remedy Petitioners' injuries.

The Service and the State (collectively, "Respondents") argue the Jackson elk herd will continue to use the two other state feedgrounds and the Refuge in the Gros Ventre, regardless of whether the Service issues a permit for the use of NFS land at Alkali Creek Feedground. Further, nothing in the record supports the notion that the spread of CWD can be halted. Thus, according to Respondents, a favorable decision will not afford Petitioners the kind of tangible, meaningful results in the real world necessary for Article III standing.

As to standing, the Court agrees with Petitioners. The issue isn't whether the spread of CWD can be halted, or whether WGFD will continue to use feedgrounds to manage elk in the Gros Ventre. The issues concern the long-term use of NFS lands at Alkali Creek as a feedground, and whether that use was reasonably approved as consistent with law, following the required procedures, and after a consideration of all relevant factors. Whether Petitioners' arguments are persuasive is a merits-based matter separate from standing. Petitioners need only allege the long-term use of Alkali Creek Feedground will have *some* impact on and pose *some* risk to their interests. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012).

Not only have Petitioners made this showing but the Service admits the alternative of not issuing the long-term use permit "would remove the small contribution of the

Alkali Creek Feedground 'toward increased prevalence, incidence, and persistence of CWD in the Jackson elk herd unit and elk herds in Western Wyoming, should the disease become established during the period allowed by the permit.'" Doc. 62, p. 61-62 (citing AR28881). Whether Alkali Creek Feedground poses a small or somewhat larger risk is immaterial, as the risk is not speculative. *Friends of the Earth, Inc.*, 528 U.S. at 181 (the redressability prong is met when "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). Therefore, Petitioners have adequately demonstrated Article III standing.

B.    *Exhaustion*

The Service argues Petitioners now apparently seek a phase-out alternative at Alkali Creek Feedground (as opposed to all NFS lands), and no one raised this alternative during the administrative process. Petitioners reply by arguing the objections raised during the administrative process were sufficient to alert the agency of the need to consider the phase-out alternative.

To seek judicial relief, Petitioners were required to first raise their concerns with the agency to allow "the agency to give the issue meaningful consideration." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978); *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004); *Forest Guardians v. FS*, 495 F.3d 1162, 1170 (10th Cir. 2007). The purpose of this rule is to ensure that reviewing courts do not substitute their "judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its expertise." *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (10th

Cir. 1986). Further, claims cannot be "only vaguely and cryptically referred to." *Ark Initiative v. U.S. Forest Service*, 660 F.3dd 1256, 1261 (10th Cir. 2011) (citation omitted). However, the waiver concept behind the principle of exhaustion does not apply to problems underlying claims that are "obvious, or otherwise brought to the agency's attention." *Id*. at 1262 (citing *Forest Guardians v. U.S. Forest Service*, 495 F.3d 1162, 1170 (10th Cir. 2007)).

The Court again agrees with Petitioners. The issue before the public was the long-term use of NFS lands at Alkali Creek. Many comments urged leadership by the Service in phasing out "artificial feeding" on NFS lands, and then focused on reasons why the Alkali Creek location is significant to the Jackson elk herd (e.g., location and migration patterns). *See, e.g.*, AR19144. Others commented about the need to transition elk to natural forage by "phasing out specific feedlots." AR26847. The NFWS and NPS specifically recommended the Service consider, *for the Alkali Creek Feedground permit*, the goal of reducing reliance on winter supplemental feeding by transitioning elk to complete reliance on natural forage at an undetermined time in the future. AR28175. Then, prior to the decision on the permit, a project leader at the Refuge forwarded to the Service the district court and circuit court decisions concerning supplemental feeding on the Refuge, and recommended the Service "pay close attention to" portions of the circuit court opinion and how the decisions might have been otherwise "[i]f we were refusing to eventually end supplemental feeding." AR34191-218. The Service responded, "Something to consider when drafting the decision for Alkali." AR34191. With this record, there is absolutely no merit in suggesting the agency's attention was not drawn to

a phase-out/transition alternative at Alkali Creek.   Exhaustion does not bar any of Petitioners' claims.

## II.   Standard for Review

Under the APA, courts "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).

"The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) (citation omitted). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)).   However, this presumption

does not shield the agency from a "thorough, probing, in-depth review." *Olenhouse v. Commodity Credit Corp*, 42 F.3d 1560, 1574 (10th Cir. 1994).   Further, the "[d]etermination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency action can reasonably be said to be within that range." *Id*.

III.   Compliance with NEPA

A.   *Reasonable Range of Alternatives*

Petitioners argue the Service failed to examine a reasonable range of alternatives in violation of NEPA.   In support of this argument, Petitioners contend the Service improperly analyzed only two alternatives in detail – the "no action" alternative and the grant of the permit alternative – and failed to offer a reasoned explanation for its refusal to examine phase-out alternatives.

In response, the Service argues it reasonably eliminated the phase-out alternative from further study because it does not have the authority to direct the WGFD to stop winter feeding and that the State intends to continue to feed elk on private, state and other federal lands. AR28787; 30642.   The Service refers to *WildEarth Guardians*, 703 F.3d at 1184, in support of the proposition that, where state agency responsibility for management of wildlife is necessary for an alternative to be feasible, NEPA does not force a federal agency to consider alternatives rendered infeasible by the unwillingness or lack of cooperation of the responsible state agency. In addition, the State argues any action short of authorizing the feedground at Alkali Creek with mitigation and

modifications would have been a denial of the special use permit, which was the second alternative analyzed. Thus, the Service properly considered a reasonable range of alternatives.

In reply, Petitioners argue reliance on *WildEarth Guardians* is misplaced as the record here provides ample support for the practicability of phase-out alternatives, even without the support of the WGFD. Petitioners argue that despite this record, the Service relied solely on WGFD's stated lack of support to reject the phase-out alternative, without any analysis as to whether support could be negotiated or was even necessary.

*WildEarth Guardians* recognizes the "rule of reason" in the agency's choice of alternatives to include in its analysis. *Id.* at 1183. That case concerned the choice by the NPS to take off the table the option of reintroducing a naturally reproducing wolf population as an alternative in preparing a new elk and vegetation management plan for Rocky Mountain National Park. The "natural wolf option" was not eliminated based on state agency jurisdiction because wolves could be reintroduced in the park without state approval. *Id.* at 1185. The option was eliminated because of feasibility (small size of the park, near certainty that wolves would leave, and the resulting need for state agency management of wolves outside the park).

While instructive, *WildEarth Guardians* is not controlling. Notwithstanding the Service's efforts to argue otherwise, the Court is not dealing with jurisdictional issues surrounding the management of elk. The Court is presented with a straight-forward request by a state agency to continue the long-term use of facilities on NFS lands at Alkali Creek as an elk winter feedground. Commenters asked the Service to improve

winter range on the BTNF, then eliminate all elk feeding and restore historical migration routes. AR27484. Obviously, the commenters focused on function – the artificial feeding of elk – which the Service seized upon and then readily dismissed by saying it "does not have the jurisdiction to stop elk feeding." AR27485. But the "rule of reason" controls. Was it reasonable, within the agency's jurisdiction, and feasible for the Service to consider a shorter-term, reduced impact, and/or phase-out alternative for the use of Alkali Creek as a feedground, while taking steps to transition elk to natural winter range and support historical migration routes? The answer to this question was and is yes. The Service's focus on jurisdiction *when the issue concerns WGFD's use of NFS land*, was not a reasoned explanation for its refusal to examine phase-out alternatives.

Further, the argument that any action other than wholesale approval would be equivalent to the no-action alternative is unsupported by the record. While the State makes this argument, there is no citation to the record of any affirmative statement by the State that something other than approval of long-term use would result in the State ceasing its winter feeding activities at Alkali Creek. Indeed, since the Service's action authorizing the existing 2008 long-term special use permit for other feedgrounds, the Alkali Creek Feedground has operated under temporary (one year) special use permits. *See, e.g.,* AR17733-71.

B.    *"Hard Look" at Environmental Consequences*

Petitioners argue the Service failed to take a "hard look" at the environmental consequences of artificial feeding and its impacts on the introduction and spread of CWD in the Jackson elk herd, even if the precise extent of the effect is less certain. Petitioners

claim the Service "washed its hands" of the problem by insisting the responsibility for managing the disease ultimately fell to WGFD, and they provide as an example, the Service's action in issuing the 2015 FEIS and draft ROD prior to the finalization and approval of WGFD's CWD Management Plan. Doc. 42, p. 43-44. Petitioners claim the literature review and deference to WGFD did not constitute a meaningful analysis of how Alkali Creek Feedground *itself* contributes to the risk of CWD introduction and spread, especially given Alkali Creek's unique location which forms a natural bottleneck for elk movement in the drainage that is the "most likely point of entry" for CWD into the Jackson elk herd.[17]  AR28884; 18851; 18706.  In short, Petitioners argue the Service never explained why it could not even attempt to use the well-established methods described in the scientific literature to quantify the impacts expected from the introduction of CWD. *Id.* at p. 54.

In response, the Service argues it took the requisite hard look at the likely impacts of CWD, pointing to the white paper prepared by the Service synthesizing the best available science on CWD in elk. AR29033-45.  The Service's analysis revealed that, while "models projecting the arrival and subsequent transmission of CWD in the Jackson Hole area are highly uncertain[,] ... it is probable that [CWD] will spread throughout Wyoming." AR28853. The Service continued by focusing on the Jackson elk herd and concluded "[b]ecause other feedgrounds in western Wyoming and the Gros Ventre drainage are likely to remain operational in the absence of elk management at Alkali

---

[17] The Service takes issue with this statement arguing the references are not peer reviewed and none of the best available science in the record supports the proposition that the Gros Ventre drainage is the most likely entry point for CWD into the Jackson elk herd. Doc. 62, p. 63, n. 18.

Creek Feedground, the timing and arrival for new diseases such as CWD in the drainage and region is not likely to be greatly affected by elk management at Alkali Creek itself." AR28876. Further, the Service discussed how "Alkali Creek Feedground could become a reservoir for CWD infection if it becomes established in elk populations in northwest Wyoming," [AR28884] while also including the opposing discussion that Alkali Creek Feedground "would be less likely to become contaminated with prions" under the no-action alternative. AR28879. The Service also concluded that "feeding operations at Alkali Creek would, to a minor extent, contribute to population-level effects . . .." AR28886. Finally, the Service argues its decisionmaker was aware of the risks posed by CWD. AR 30638 ("I clearly understand and acknowledge that the Commission's action of feeding . . . increases risk of disease transmission"). The Service argues this satisfies NEPA's procedural requirement that the agency take a hard look at the environmental consequences of the proposed action, disclose those consequences, and apply the best available scientific information. Finally, the Service disagrees with the argument that it should have waited until WGFD finalized its new CWD management plan as no state management plan has been able to stop the spread of CWD and conditions were imposed allowing revocation if the plan was insufficient. AR29026-27.

The State advances many of the same arguments as the Service, in support of the claim that the agency took the requisite hard look at the effects common to both alternatives. The State argues Petitioners disagree with the Service over the impact of a single feedground on disease transmission and the conclusion of the technical report. However, disagreement is not the same as not taking a hard look. The State argues the

Service adequately obtained expert opinions in the form of reports and studies, and reviewed and synthesized the reports and studies into a single report, which was then peer reviewed. AR29160; AR29034-45. Further, the Service gave careful scientific scrutiny to the material, responded to all legitimate concerns that were raised, and fairly found the science regarding the influence of a single feedground to be overall – inconclusive. According to the State, this complies with NEPA's requirement that the agency take a hard look at the environmental consequences before taking a major action.

NEPA requires an agency look at the environmental impact of the proposed action, any unavoidable adverse environmental effects, the alternatives to the proposed action, the relationship between local short-term uses of man's environment, and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitment of resources. 42 U.S.C. § 4332(C). A court determines whether the agency "took a 'hard look' at information relevant to the decision," *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009), by asking whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for it decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Biodiversity Conservation Alliance v. Forest Service*, 765 F.3d 1264, (10th Cir. 2014) (citation omitted). NEPA does not impose substantive limits on agency conduct. *Robertson v. Methow Valley Citizens' Council*, 490 U.S. at 350. "Rather, once environmental concerns are 'adequately identified and evaluated' by the agency, NEPA places no further constraint on agency actions." *Friends of the Bow v. Thompson*, 124

F.3d 1210, 1213 (10th Cir. 1997) (citation omitted).   Nonetheless, NEPA's "action-forcing" purpose "gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process.'"  *Robertson v. Methow Valley Citizens' Council*, 490 U.S. at 349 (citation omitted).

The record reflects the Service took a hard look at certain environmental impacts of the proposed action and no-action alternative.  However, the Service's failure to consider a reasonable range of alternatives results in the conclusion that the Service failed to take a hard look at the alternatives to the proposed action, some of which might mitigate impacts.

Further, while not a specific focus of the arguments by the parties, there is little to indicate the Service took much of a look at the relationship between a stepped, phase out approach compared to longer-term use of the site as a feedground, and the maintenance and enhancement of long-term productivity.  There is also little to suggest the Service took a hard look at the irreversible and irretrievable commitment of resources.  Both considerations are required by 42 U.S.C. § 4332(C).  There is no question that Alkali Creek Feedground could become a reservoir for CWD infection if it becomes established in elk populations in northwest Wyoming.   That potential is increased with the concentration of elk at feedgrounds.  If infected animals congregate, the environment will eventually be contaminated.  This will significantly affect vegetation and soils, thus productivity, over a very long term (if not indefinitely) and may result in an irreversible and irretrievable loss of wildlife and habitat.  However, the Service's only analysis and evaluation was of the longer-term use of the site as a feedground and the no-action

alternative, without any evaluation of reduced impact or phase-out alternatives, or how these various alternatives affect *all* the considerations required to be evaluated under 42 U.S.C. § 4332(C).

Finally, there is no question that the Commission overseeing the WGFD decides whether or not to feed elk in the winter.  However, this does not excuse the Service from taking a hard look at the consequences of *its* action to allow the long-term use of NFS lands at Alkali Creek as a feedground.  Relevant to the Service (and not simply within WGFD jurisdiction) are the problems that artificial feeding increases the risk of disease transmission, increases the risk that the site will be contaminated with prions for a very long time, and also appears to blindly support WGFD's goal of managing elk movements to prevent commingling with livestock and danger to agricultural land, notwithstanding the BTNF Land and Resource Management Plan that includes a stated goal to "[h]elp re-establish historic elk migration routes to provide increased viewing and hunting opportunities for outfitters and clients." AR119.  Based on the record, feedgrounds seem to undermine this goal.  For all these reasons, the 2015 FSEIS is inadequate in that it fails NEPA's hard look requirement.

C.   *Cumulative Impacts*

Petitioners argue the Service failed to meaningfully analyze the cumulative impacts of the region's feedgrounds on wildlife resources, in violation of NEPA. Specifically, Petitioners complain that the Service refused to examine the impacts of Alkali Creek Feedground in conjunction with the other feedgrounds located in the BTNF, or the artificial feeding program conducted by the NFWS on the Refuge.  Rather, the

Service restricted its evaluation of cumulative impacts to include effects only from Alkali Creek and the other feedgrounds in the Gros Ventre drainage (Fish Creek and Patrol Creek), thereby severing analysis of this action's impacts from the effects of other nearby feedground operations impacting the same elk herd, as well as the effect of the 2007 BEMP on the Refuge which anticipates a step-down approach to phase out artificial feeding. Petitioners argue these feedgrounds are all part of an integrated program which cumulatively impacts the Jackson elk herd, and the restricted analysis by the Service violates NEPA.

In response, the Service argues that it considered the threat of CWD to the Jackson elk herd and considered the additive contribution of the Alkali Creek Feedground to that threat. The Service also notes that its analysis supplements the 2008 FEIS, which analyzed the impacts of the other feedgrounds in one document and cannot now be challenged. According to the Service, it was not required to redo that analysis. As to the 2007 BEMP, the Service argues it incorporated that plan by reference, and discussed how use of the Alkali Creek Feedground will lower the numbers of overwintering elk at the Refuge. Further, no framework has yet emerged for transitioning from winter feeding on the Refuge to greater reliance on natural forage. Absent a framework, the Service argues it cannot consider specific impacts to Alkali Creek.

As to cumulative impacts, the Court again agrees with Petitioners. The finality of the 2008 FEIS does not eliminate the need for the Service to consider cumulative impacts from the integrated feedground program considering the best and currently available science that has advanced the understanding of CWD risk, transmission and mitigation

since the 2008 analysis.  Also, the Service need not await a specific framework for the implementation of the 2007 BEMP, but may reasonably rely on the good faith representation that the agencies aim to implement the transition sometime during the life of the Alkali Creek Feedground permit.[18]  This requires the Service to examine how granting the permit through 2028 or some shorter term would interrelate with, potentially support, or potentially undermine, the objectives of the combined agency work under the 2007 BEMP.

IV.   APA

Petitioners argue the permit and record of decision violate the APA because they fail to analyze the factors set forth in federal laws governing national forests and instead impermissibly defer to WGFD's objectives.  Given the conclusion that the Service failed to comply with NEPA procedural requirements, the Court concludes the agency action violated the Administrative Procedure Act.

## CONCLUSION

The Service approved WGFC's special use permit for the Alkali Creek Feedground without complying with the procedural requirements of NEPA. Accordingly, the Court VACATES the Service's decision to amend the existing 2008 long-term special use permit to reauthorize the continued use of NFS lands for winter elk

---

[18] The goal in the 2007 BEMP is for a progressively managed phase-out of artificial feeding and transition to natural forage on the Refuge over a fifteen-year period (ending 2022), compared to the term of the amended 2008 special use permit which is twenty years (ending 2028). AR10393-4; 11104.

feedground activities at Alkali Creek Feedground, and REMANDS to the agency for further proceedings consistent with this decision.[19]

Dated this ___14th___ day of September, 2018.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE

---

[19] Nothing in this decision adjudicates, directs, or prohibits the issuance by the Service of temporary (one year) Special Use Permits to the WGFD Commission for Alkali Creek Feedground, as has been its interim practice. *See, e.g.,* AR17733-71.